UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

UNITED STATES OF AMERICA

v.  Criminal Action No. 2:24cr87

MICHAEL LEE COREY MALONE
(a/k/a "Christopher Matthew Feagin"),
Defendant.

## **OPINION**

On July 10, 2024, Michael Lee Corey Malone made a phone call from jail. With a friend's assistance, Malone dialed the federal courthouse in Alexandria, Virginia, and allegedly told the answering clerk, "there's a bomb in your building." On August 2, 2024, Malone purportedly made a second call—this one to the Richmond, Virginia, federal courthouse—and stated he had placed a bomb in the facility. For this conduct, a federal grand jury indicted Malone for two counts of interstate threats by telephone, in violation of 18 U.S.C. § 844(e), and one count of influencing, impeding, or retaliating against a federal official, in violation of 18 U.S.C. § 115(a)(1)(B). But because this Court has ruled Malone incompetent, the United States cannot try the defendant for these charges unless he regains competency. Malone is unlikely to do so without antipsychotic medication. Thus far, he has refused to take such drugs.

The government now moves for a preliminary determination that it has satisfied the first factor of the involuntary medication framework established by *Sell v. United States*, 539 U.S. 166 (2003). *Sell* permits the forced administration of antipsychotic drugs to render a nondangerous defendant competent to stand trial if the government first establishes that important governmental interests are at stake. The government's interest in bringing to trial a defendant accused of a serious crime is important, but special circumstances can lessen that importance.

Malone's alleged hoax phone calls may be serious crimes under *Sell* and its progeny, but the defendant's pretrial detention, his possible civil commitment, and the nature of the alleged conduct present special circumstances that diminish the government's interest in criminal prosecution. For the reasons set forth below, the Court will deny the government's motion for a preliminary determination that it has satisfied the first factor of the *Sell* standard.

## I. BACKGROUND

### *A. Factual Allegations*

Malone faces charges for threatening to bomb the federal courthouses in Alexandria, Virginia, and Richmond, Virginia. (ECF No. 22.) Malone allegedly made the first of two hoax phone calls from the Virginia Beach City Jail on July 10, 2024. (ECF No. 45, at 2.) With a friend's help, Malone dialed the Alexandria courthouse to ask about the status of his civil suits.[1] The defendant provided his name and case numbers to the answering clerk, who in turn provided Malone with information about his litigation. (ECF No. 45, at 2; ECF No. 43, at 1–2.) After receiving these updates, Malone allegedly stated, "I would just like to tell you that, um, I'm supposed to be released tomorrow and that there's a bomb in your building and upon my release

---

[1] (*Id.*) In 2021, Malone filed a complaint in this district alleging that members of the Virginia Beach Sheriff's Office and his ex-wife were conspiring to kill him. Compl., *Malone v. Mun. of Va. Beach, et al.*, No. 1:21cv1376 (E.D. Va. Dec. 9, 2021), ECF No. 1, at 4–5. The civil case pending in summer 2024 (when Malone allegedly made these phone calls) was the second filed by defendant, albeit under his alias, Christopher Feagin. Compl., *Feagin v. Bass, et al.*, No. 1:24cv1033 (E.D. Va. June 12, 2024), ECF No. 1, at 4–6. Both matters were ultimately dismissed. *See* Order, *Malone v. Mun. of Va. Beach, et al.*, No. 1:21cv1376 (E.D. Va. July 13, 2022), ECF No. 19, and Order and Clerk's J., *Feagin v. Bass, et al.*, No. 1:24cv1033 (E.D. Va. July 12, 2024), ECF Nos. 5 and 6.

I'm going to kill the president." A few weeks later, on August 2, Malone allegedly called the Richmond courthouse and stated he had placed a bomb in the building.[2]

A grand jury initially indicted Malone on August 7, 2024, but later returned a superseding indictment to include the August 2, 2024, phone call. (ECF Nos. 1, 8.) The government filed a second superseding indictment on December 9, 2024, and the Court arraigned the defendant on this charging instrument the following day. (ECF Nos. 22, 26.)

### B. Procedural History and Competency Issues

On the same day as his arraignment on the second superseding indictment, Malone moved to proceed *pro se*. (*See* ECF No. 25.) But concerns about Malone's competency arose at the hearing held on the defendant's motion pursuant to *Faretta v. California*, 422 U.S. 806 (1975). (ECF Nos. 27, 29, 31.) At the *Faretta* hearing, Malone stated that his ex-wife and jail officials

---

[2] (ECF No. 45, at 2.) The parties vigorously dispute the caller's intent and motive. For its part, the government casts the calls as intentional threats "targeted [at] the federal judiciary because of [Malone's] frustration with the lack of action in his meritless civil cases." (ECF No. 43, at 4 (alterations added).) By contrast, Malone claims "neither [call] was understood to communicate any serious threat," as investigators "immediately verified" Malone's incarcerated status and deemed the calls hoaxes. (ECF No. 45, at 3 (alteration added).) The defendant also cites his friend's reaction—who remained on the line during the Alexandria call and "said she wasn't 'cool' with what he said"—and the fact that the calls' recipients "felt calm and unconcerned" (Alexandria) and did not "relay[] . . . any greater degree of distress" (Richmond) as indicative of the calls' triviality. (*Id.*)

In any event, the Court finds significant the undisputed fact that neither call triggered an evacuation of either courthouse. (*See id.* at 2–3 (regarding the first, "the call was deemed a hoax and no evacuation was recommended," and regarding the second, "there is no indication the Richmond courthouse was evacuated").) Further, the government presents no evidence that the Secret Service or any other presidential security force received information about, or acted in any way upon, the July 10, 2024, call.

3

were conspiring to murder him.[3] In light of these comments, the Court directed a defense expert to evaluate Malone's mental health and competency. (ECF Nos. 33, 34.)

In April, 2025, the defense expert opined that Malone lacked the mental competency to stand trial. (ECF Nos. 37–39.) The Court held a hearing on the evaluation on April 21, 2025, at which it conducted its own questioning of Malone and declared him mentally incompetent to proceed. (ECF Nos. 39, 40.) The Court then committed Malone to the custody of the Attorney General, pursuant to 18 U.S.C. § 4241, to determine "whether there [was] a substantial probability that in the foreseeable future he [would] attain the capacity to permit the proceedings to go forward." 18 U.S.C. § 4241(d)(1); (*see* ECF No. 40.)

Malone arrived at Federal Medical Center ("FMC") Butner for evaluation and competency restoration efforts on July 16, 2025. For several months, Bureau of Prisons ("BOP") staff further assessed Malone and attempted to restore his competency. Dr. Allyson Sharf, Forensic Psychologist at FMC Butner, submitted her evaluation of the defendant to the Court in December, 2025. (ECF No. 44, at 8.) Dr. Sharf concludes that Malone continues to suffer from a mental disease or defect that renders him incompetent to stand trial. (*Id.* at 14.) Specifically, Dr. Sharf diagnoses Malone with delusional disorder[4] and antisocial personality disorder based on various psychological tests administered. (*Id.*) Malone's delusional beliefs "largely center on paranoid themes"—chiefly, he believes "others," "including his ex-wife and the Sheriff's Department," "are conspiring to have him murdered." (*Id.*) The defendant's delusions persist despite his reportedly

---

[3] (*See* ECF No. 31; ECF No. 45, at 3 (describing Malone's delusion as "his long-held belief that various persons and groups are conspiring against him").)

[4] Per Dr. Sharf, the "essential feature" of delusional disorder "is the presence of one or more delusions that persist for at least one month." (*Id.* at 11.) Delusions "are fixed, rigid beliefs that are inconsistent with reality." (*Id.*)

4

not using substances for "several years," and they cause Malone to have significant "deficits" with respect to his "rational understanding" and "ability to assist counsel in his defense." (*Id.* at 13–14.) Notwithstanding Malone's untreated psychiatric symptoms, the defendant "has been free from aggressive or self-destructive behavior" since his arrival at FMC Butner. (*Id.* at 14.) Indeed, "there is no convincing evidence . . . Malone currently poses a substantial risk of dangerousness in the current conditions of his confinement." (*Id.*)

Dr. Sharf submits that "a substantial probability exists" that Malone's competency "can be restored with . . . antipsychotic medicine." (*Id.* at 13.) Thus far, Malone "has refused to accept [this] recommended medication treatment on a voluntary basis." (*Id.*) But the buck does not stop with Malone's refusal to take antipsychotic drugs. Because the law allows (in certain circumstances) the forced medication of an otherwise-incompetent defendant, the government now moves for a finding that "important government interests are at stake in bringing the defendant to trial." (ECF No. 43, at 6 (punctuation omitted).) Such a finding would satisfy one of the four prerequisites to involuntary medication in this case.

On February 2, 2026, however, the government brought a civil commitment proceeding against Malone in the Eastern District of North Carolina.[5,6] The Court heard argument on the

---

[5] *See* Cert., *United States v. Malone*, 5:26hc2018 (E.D.N.C. Feb. 2, 2026), ECF No. 1. The Eastern District of North Carolina granted a stay in the civil commitment matter pending the Court's resolving the instant motion. *See* Order, *United States v. Malone*, 5:26hc2018 (E.D.N.C. Feb. 12, 2026), ECF No. 11.

[6] *See* 18 U.S.C. § 4246(a), which provides, in relevant part:

> If director of a facility in which a person is hospitalized certifies that a person in the custody of the Bureau of Prisons . . . who has been committed to the custody of the Attorney General pursuant to section 4241(d), or against whom all criminal charges have been dismissed solely for reasons related to the mental condition of the person, is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or

government's motion in this district four days later. (ECF No. 48.) Thus far, Malone has spent fourteen months—and counting—in pretrial custody. (ECF No. 43, at 5; ECF No. 45, at 11.)

## II. ANALYSIS

### A. *Involuntary Medication for Restoring Competence*

Our Constitution "permits the [g]overnment involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial," but only if the government satisfies four factors "by clear and convincing evidence." *Sell*, 539 U.S. at 179; *United States v. Bush*, 585 F.3d 806, 809, 814 (4th Cir. 2009). "First," a court must find that "*important* governmental interests are at stake." *Sell*, 539 U.S. at 180 (emphasis in original). Assuming important interests, the court must next conclude that "involuntary medication will *significantly further* those concomitant state interests."[7] Third, the court must determine that "involuntary medication is *necessary* to further those [important governmental] interests"—a tailoring question akin to strict scrutiny review.[8] Fourth, and finally,

---

serious damage to property of another, and that suitable arrangements for State custody and care of the person are not available, he shall transmit the certificate to the clerk of the court for the district in which the person is confined. . . . The court shall order a hearing to determine whether the person is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another. A certificate filed under this subsection shall stay the release of the person . . . .

[7] *Sell*, 539 U.S. at 181 (emphasis in original). The court must find that administering the drugs "is substantially likely to render the defendant competent . . . and substantially unlikely to have side effects that will interfere with the defendant's ability to assist counsel." *Id.* (citation omitted).

[8] *Id.* (emphasis in original). As part of this prong, the court must consider less intrusive means for administering the medication, such as "a court order to the defendant backed by the contempt power." *Id.*

6

the court must "conclude that administration of the drugs is *medically appropriate, i.e.,* in the patient's best medical interest in light of his medical condition."[9]

Satisfying this standard "permit[s] involuntary administration of drugs solely for trial competence purposes in certain instances"—"[b]ut those instances may be rare." *Id.* at 180. Indeed, the Fourth Circuit "has never departed from the recognition that such [involuntary medication] orders are a tool that must not be casually deployed, for forced medication is a serious intrusion upon the integrity of the individual and the effects of such medication upon the body and mind are often difficult to foresee." *United States v. Chatmon*, 718 F.3d 369, 374 (4th Cir. 2013). Courts have therefore "set a deliberately high standard for the government to satisfy before it may forcibly medicate solely to render an inmate competent to stand trial."[10]

---

[9] *Id.* (emphasis in original). The "specific kinds of drugs at issue may matter here, as elsewhere," because "different kinds of antipsychotic drugs may produce different side effects and enjoy different levels of success." *Id.*

[10] *United States v. Sheikh*, 651 F. App'x 168, 171 (4th Cir. 2016) (quoting *United States v. Watson*, 793 F.3d 416, 420 (4th Cir. 2015)). The *Sell* line of cases applies because the government does not contend, nor does BOP suggest, that medication is necessary to render Malone nondangerous to himself or others. (*See* ECF No. 44, at 14 (noting that, because Malone "is not gravely disabled nor does he present an imminent risk of danger to himself or others," the "only mechanism" by which BOP may pursue involuntary medication "is for this Court to make a ruling within the parameters established in *Sell v. United States*"); ECF No. 45, at 4.)

Indeed, "the inquiry into whether medication is permissible to render an individual nondangerous is usually more objective and manageable than the inquiry into whether medication is permissible to render a defendant competent." *Sell*, 539 U.S. at 167; *see Washington v. Harper*, 424 U.S. 210, 227 (1990) ("[T]he Due Process Clause permits the [s]tate to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, *if the inmate is dangerous to himself or others* and the treatment is in the inmate's medical interest" (emphasis added).). In dangerousness cases, forced medication "amount[s] to a constitutionally permissible accommodation between an inmate's liberty interest in avoiding the forced administration of antipsychotic drugs and the [s]tate's interests in providing appropriate medical treatment to reduce the danger that an inmate suffering from a serious mental disorder represents to himself or others." *Sell*, 539 U.S. at 178 (citing *Harper*, 494 U.S. at 236) (cleaned up). But this "usually more objective and manageable" standard cannot guide the Court here. *See Sell*, 593 U.S. at 167.

7

### B. First Factor: Important Governmental Interests

Here, the government seeks a determination only on the first *Sell* factor: Whether *important* governmental interests are at stake.[11] The government's interest in bringing to trial an individual accused of a serious crime is important, whether the offense "is a serious crime against the person or . . . property." *Id.* The next question follows: What constitutes a "serious crime" under this standard?

The "central consideration" of the seriousness analysis "is the 'maximum penalty authorized by statute.'" *Chatmon*, 718 F.3d at 374 (quoting *United States v. Evans*, 404 F.3d 227, 237 (4th Cir. 2005)). *United States v. White* offers one data point: "[W]ithout establishing a hard and fast rule," "a crime is serious for involuntary medication purposes where the defendant face[s] a ten-year maximum sentence for the charges against him." 620 F.3d 401, 410 (4th Cir. 2010) (citing *Evans*, 404 F.3d at 238). The Fourth Circuit thus recognizes a "preference of looking to the statutorily-authorized maximum sentence" for determining whether a crime is serious—but the appellate court "ha[s] not flatly rejected consideration of the likely [G]uidelines sentence in an appropriate case."[12]

---

[11] *Sell*, 539 U.S. at 180 (emphasis in original). Defense counsel contends that the Court should not "isolate the first *Sell* factor" "[a]bsent some authority to support the bifurcation of this fact-intensive and interconnected standard." (ECF No. 45, at 2, 18.) The Court finds such authority in its sister courts. *See, e.g., United States v. Coy*, 991 F.3d 924, 926 (8th Cir. 2021) (discussing how the Western District of Missouri trial court found that "there were important government interests at stake, the first element under *Sell*," and subsequently "ordered the staff of FMC Butner to prepare an 'Addendum and Treatment Plan' to address the other *Sell* elements"). This approach also conserves prison resources and serves judicial economy: Because *Sell* requires the government to satisfy all four prerequisite elements, an insufficient showing on the first prong obviates the need for BOP to propose detailed treatment for Malone and for the Court to assess that proposal for the remaining three prongs.

[12] *White*, 620 F.3d at 410 n.7 (alterations added) (citing *Bush*, 585 F.3d at 814 ("First, even though each count of the indictment . . . carries a maximum 10–year sentence, the Sentencing Guidelines, the government's concessions, and the district court's observations indicate that if [the

But even if the Court finds Malone's charges serious crimes in light of their maximum authorized penalties, the first factor also requires the Court to "consider the facts of [Malone's] individual case in evaluating the [g]overnment's interest in [his] prosecution." *Sell*, 539 U.S. at 180 (alterations added). Critically, "special circumstances may lessen the importance." *Id.* The Supreme Court identifies at least two "special circumstances" that weaken the government's interest: First, a defendant's "failure to take drugs voluntarily . . . may mean lengthy confinement in an institution for the mentally ill." *Id.* Such "potential for future confinement affects, but does not totally undermine, the strength of the need for prosecution." *Id.* Second, "[t]he same is true of the possibility that the defendant has already been confined for a significant amount of time" on a pretrial basis. *Id.* (alteration added).

But these "two enumerated special circumstances" do not "constitute the full compendium of circumstances district courts can or should consider." *United States v. Duncan*, 968 F. Supp. 2d 753, 759 (E.D. Va. 2023). The Court must look beyond pretrial detention and possible future commitment. Indeed:

> [The Fourth Circuit] reject[s] the . . . assertion that [the] special circumstances analysis is limited to considering whether [the defendant] is subject to civil commitment and whether [the defendant] has been confined for a significant period of time. In *Sell*, the Supreme Court clearly stated that the inquiry is a fact-specific one: "Courts, however, must consider the facts of the individual case in evaluating the [g]overnment's interest in prosecution. Special circumstances may lessen the importance of that interest." *Sell*, 539 U.S. at 180[.] . . . The Court then provided a nonexclusive list, as evidenced by its use of the term "for example" in the sentence

---

defendant] were found guilty, she would likely be sentenced to only time served" (alteration added)).

Notably, "other circuits have not expressed such a preference" for looking to the statutorily authorized maximum penalty. Rather, sister courts "have recognized that the federal sentencing [G]uidelines also provide a reasonable metric by which the seriousness determination may be made." *Id.* (alteration added) (citing *United States v. Valenzuela–Puentes*, 479 F.3d 1220, 1226 (10th Cir. 2007), and *United States v. Gomes*, 387 F.3d 157, 160 (2d Cir. 2004)). As discussed further below, the Court examines Malone's alleged crimes under both metrics.

9

immediately following its announcement that special circumstances may lessen the government's interest. *Id.* Further, [the Fourth Circuit] ha[s] already recognized the flexible nature of [the] special circumstances inquiry in *Evans*, where [the Fourth Circuit] explicitly stated that length of incarceration is not necessarily the only factor relevant to whether special circumstances undermine the government's interest.

*White*, 620 F.3d at 412 n.9 (citing *Evans*, 404 F.3d at 240) (alterations added).[13]

### C. Discussion

The Court thus begins with the "central consideration" of the maximum penalties authorized for Malone's charges. *Chatmon*, 718 F.3d at 374 (quoting *Evans*, 404 F.3d at 237).

---

[13] *Evans* and *United States v. Bush* merit further discussion here. In *Evans*, the defendant first faced charges for threatening an employee of the United States Rural Development Agency, in violation of 18 U.S.C. § 111(a)(1). 404 F.3d at 233. During *Sell* proceedings on that charge, Evans threatened to murder the presiding magistrate judge and her family. *Id.* at 234. Specifically, "Evans stated to fellow inmates that the magistrate judge was responsible for his continued incarceration, that 'he [had] a good idea where [the magistrate judge] reside[d],' and that 'when he [was] released from prison he [would] find her, hunt her down, and get rid of her and her family.'" *Id.* (alterations added). These threats triggered charges under 18 U.S.C. § 115(a)(1)(B) (which prohibits threatening to murder United States judges) and further *Sell* analysis, after which the Fourth Circuit affirmed that the government had a sufficiently important interest in prosecuting a defendant for "threatening to murder a United States judge." *Evans*, 404 F.3d at 232.

In *Bush*, the defendant sent multiple letters threatening physical harm against federal judges, in violation of 18 U.S.C. § 876(c). 585 F.3d at 811. Bush wrote to the judges stating that her "intentional infliction of (or, if she misses, her attempt to inflict) physical harm . . . , or her threat to inflict such harm, [would be] . . . justified [if] she act[ed] in proper self-defense against" the three named judges. *Id.* at 810 (alterations added). Bush also wrote that she "may slay" any of the addressee judges "if it reasonably appear[ed] to . . . be necessary." *Id.* (alterations added). Despite various special circumstances presented, the Fourth Circuit affirmed the district court's holding that the government satisfied the first *Sell* factor. *Id.* at 815.

The government urges the Court to analogize, almost blindly, to *Evans* and *Bush*: As those defendants' explicit threats to kill United States judges sufficed as serious under *Sell* prong one, so too must Malone's courthouse calls constitute serious crimes. (*See, e.g.*, ECF No. 43, at 4–5.) But *White* explicitly rejects wholesale reliance on *Evans* and *Bush*, which "provide guidance" but "do not control the outcome of [the Court's] fact-intensive inquiry into the special circumstances" of Malone's case. 620 F.3d at 411.

10

Both charges carry ten-year statutory maximum terms of imprisonment.[14] These upper bounds match the data point offered by *White*, which held, without establishing a rule, that a crime is serious for involuntary medication purposes when the defendant faces a ten-year maximum sentence. 620 F.3d at 410. This precedent, however, does not foreclose the Court's examining the Guidelines as a "reasonable metric by which the seriousness determination may be made." *Id.* at 410 n.7. Here, the government suggests Malone could face a Guidelines range as low as 33–41 months' imprisonment, or as high as 85–105 months' imprisonment. (*See* ECF No. 43, at 5.) Even the projected maximum (105 months) falls meaningfully short of the ten-year mark (120 months).[15]

The Court assumes without deciding that Malone's charges are serious in light of their ten-year statutory maximums. Accordingly, the United States initially presents an important governmental interest in Malone's prosecution. *See White*, 620 F.3d at 410. But the Court must consider more than statutory maximums. It must also consider the facts of Malone's individual case in evaluating the government's interest in his prosecution. *See Sell*, 539 U.S. at 180. With those facts at the forefront, the United States fails to meet its burden by clear and convincing evidence. *See Bush*, 585 F.3d at 809, 814.

First, the two enumerated special circumstances in *Sell* weigh heavily against the government. The United States initiated a civil commitment proceeding against Malone in the

---

[14] *See* 18 U.S.C. § 115(a)(1)(B), (b)(1)(B)(ii) (authorizing imprisonment for up to ten years "if the assault involved . . . the intent to commit another felony," as here); *id.* § 844(e) (providing for a maximum term of imprisonment of 10 years).

[15] The Court cannot calculate Malone's Guidelines range with certainty at this stage. For the instant motion, however, both the lower and higher ranges offered by the government are shorter than the ten-year mark set by *White*. Moreover, the 85–105-month range assumes every anticipated Guidelines enhancement actually applies and every expected Presentence Investigation Report objection resolves in favor of the government. (*See* ECF No. 45, at 12–14.)

11

Eastern District of North Carolina on February 2, 2026. Further, the United States has held Malone for fourteen months (and counting) in pretrial custody. Both Malone's possible future confinement and his year-plus pretrial detention substantially lessen the government's interest in the instant criminal prosecution. *See Sell*, 539 U.S. at 180.

Looking beyond Malone's past, present, and possible future incarceration to the "full compendium of circumstances" district courts should consider only bolsters the Court's analysis. *See Duncan*, 968 F. Supp. 2d at 759. All-but-guaranteed appellate litigation, the time necessary for antipsychotic medication to take effect, and additional competency restoration efforts, minus good conduct credits, suggest that Malone's prosecution could take years, only to yield a sentence significantly shorter than this litigation time—or, indeed, no sentence at all on account of time served.[16,17] Further, Fourth Circuit precedent clearly establishes *some* threats to government

---

[16] *See id.* at 759, 761–67 (discussing how important governmental interests "[were] initially at stake," but that the time already spent in custody, the likelihood of future confinement, and a likely successful insanity defense "mitigate[ed] the [g]overnment's interests" on *Sell* prong one) (alterations added).

[17] Malone calculates an "effective sentence" of at least forty-one months "before he can be tried, and even more before he [can] be sentenced." (ECF No. 45, at 14 (alteration added).) Malone's calculation includes the fourteen months he has spent in pretrial custody, plus a month for the Court to resolve the instant motion, plus four months to litigate the remaining *Sell* factors and for the Court to possibly order medication, plus "at least another six months" for an appeal of that order, plus "another six months to seek *en banc* and Supreme Court review," plus another six months for the defendant to "be forced to take the prescribed medication" and reevaluated for competency, and finally, an additional four months of "good credit time." (*Id.* at 11.)

The Court does not embrace Malone's math as fact, but it agrees with the defendant that the timeline of his case versus his potential sentence gravely undercuts the government's interest. If the government's low-end Guidelines estimation proves accurate, Malone could face a Guidelines range no higher than his forty-one month projected "effective sentence." (*See* ECF No. 43, at 5.) Even if Malone's ultimate Guidelines range more closely resembles the government's high-end projection, the amount served post-sentencing would fall between 44 and 64 months accounting for time already served. A Guidelines sentence in this range would pale in comparison to the ten-year benchmark set by *White*, amounting to a significant amount of time that mitigates the government's important interests. *See* 620 F.3d at 414 ("To determine if [a criminal defendant]

officials qualify as sufficiently serious regardless of special circumstances—but the circumstances of *these* threats demand a different result. *But see Evans*, 404 F.3d at 232–34; *Bush*, 585 F.3d at 809–15. Again, authorities did not evacuate either courthouse in the wake of Malone's alleged calls—nor, apparently, did law enforcement contact the president's security team in any way.[18,19]

In short, the overwhelming special circumstances present here render the government's interest in criminally prosecuting Malone negligible. That interest, if it exists at all, is not an "important" one under the law. *See Sell*, 539 U.S. at 180. The Court cannot order the defendant's forcible medication on such a showing.

---

has been in custody a significant amount of time as compared to [his] likely sentence, [the district court] must calculate [the criminal defendant's] time served, [his] likely sentence, and then ask whether the former is significant in light of the latter") (cleaned up).

[18] *See supra* n.2. And, unlike the defendants in *Evans* and *Bush*, the caller did not direct the bomb "threats" to any named federal judge, or even to any named judicial employee. Indeed, arguably, the first part of the July 10, 2024, call contained no threat at all. That call first indicated "there's a bomb in your building," referring to the Alexandria courthouse, which sounds more like "maliciously convey[ing] false information knowing the same to be false" than "willfully mak[ing] a[] threat." *See* 18 U.S.C. § 844(e) (alterations added); (ECF No. 43, at 2.)

Of course, the caller allegedly continued to say, "upon my release I'm going to kill the president." (ECF No. 43, at 2; ECF No. 45, at 2.) This clause identifies a specific individual (then-President Joe Biden) and makes a threat against his life. Likely in recognition of the July 10, 2024, call's dual nature, the second superseding indictment charges Malone in the conjunctive: The government could prove either a willfully made threat or the malicious conveyance of false information to sustain a conviction on the § 844(e) counts. (*See* ECF No. 22, at 1–3.) Nonetheless, the discrepancies between this case's alleged threats against the judiciary and the threats against the judiciary present in *Evans* and *Bush* heavily mitigate the government's prosecutorial interest.

[19] Because the Court assumes without deciding that Malone's charges are indeed serious, the Court evaluates the crimes qualitatively as part of the special circumstances analysis. *See, e.g., Duncan*, 968 F. Supp. 2d at 767 (discussing the "nature" of the crime charged and how that offense "[was], at its core, nonviolent," as part of the court's assessment of one special circumstance) (alterations added); *see also White*, 620 F.3d at 413, 419 (considering the "nature of [White's] crime" as part of the special circumstance analysis) (alteration added).

13

## III. CONCLUSION

The federal courts have "set a deliberately high standard for the government to satisfy before it may forcibly medicate solely to render an inmate competent to stand trial." *See Sheikh*, 651 F. App'x at 171. The Court refuses to lower that bar here. For the foregoing reasons, the Court will deny the government's motion for a preliminary determination that it has satisfied the first factor of the involuntary medication framework established by *Sell v. United States*, 539 U.S. 166 (2003). (ECF No. 43.) Because the government has failed to meet its burden on the first prong, and because *Sell* requires all four of the factors to be met before forcibly medicating a defendant, the Court will not analyze the standard's other prongs. *See id.*

Malone remains in the custody of the Attorney General pursuant to 18 U.S.C. § 4241(d). Accordingly, the parties must file any relevant motions to further the disposition of this case. Until that time, Malone will remain in the custody of the Attorney General under psychiatric care.

The Court will enter an appropriate Order.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: 4 March 2026
Richmond, VA

/s/ 
John A. Gibney, Jr.
Senior United States District Judge